IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACOB MOLINA,

              Plaintiff,

v.                                                   Case No. 13-1025-JTM

AGENTS GREG PEREZ and
KARL TIMMONS, in their
individual capacities,

              Defendants.

MEMORANDUM AND ORDER

This case stems from two law enforcement officers confusing an innocent man with a criminal suspect because of his similar name, a mistake that is apparently all too common.[1] The court has before it a Motion for Summary Judgment (Dkt. 18) by defendants Greg Perez and Karl Timmons. Plaintiff Jacob Molina has filed a motion requesting a hearing on the motion. *See* Dkt. 31. The court is prepared to rule on both motions.

**I. Undisputed Facts**

Plaintiff Jacob Molina is a pastor who lives with his wife on Barron Road in Wichita, Kansas. The couple owns a home located at 2216 S. White Cliff Road, also in Wichita. Mr. Molina lets his brother-in-law live at the White Cliff house. Mr. Molina's brother-in-law and father-in-law share the same name: Jose Florencio Flores-Euceda.

---

[1] *See* Stephanie Chen, *Officer, You've Got the Wrong Person*, CNN.COM, Feb. 15, 2010, http://www.cnn.com/2010/CRIME/02/15/colorado.mistaken.identity.arrest/; *see also* Christopher N. Osher, *Wrongfully Jailed: Records Detail More Than 500 Mistaken-identity Arrests in Denver in Seven Years*, DENVER POST, Jan. 8, 2012, *available at* http://www.denverpost.com/ci_19697991.

Defendant Perez has been employed by ICE and its predecessor agency, Immigration and Naturalization Service, since May 1997. He is currently a Deportation Officer (DO) under the ICE Office of Enforcement and Removal Operations (ERO). Defendant Timmons has been employed by ICE for approximately 19 years. He is currently employed as a DO with the ICE ERO, Fugitive Operations Team in Wichita. Both defendants have training on the proper use of force by law enforcement officers.

On July 1, 2011, the defendants received information about an individual named Jose Antonio Flores-Hernandez, a citizen of Honduras with an outstanding warrant of removal that was issued in August 2005. Through a search of available databases, Timmons determined that a male with the target's name and date of birth possibly resided at 2216 S. White Cliff Road, Wichita, Kansas 67207.

Timmons conducted surveillance at the target address twice in August 2011. He ran registration checks on the license plates of vehicles parked at the target address and discovered who owned the vehicles. One of the license plates was registered to Jacob Molina, whose address was shown as 9130 E. Barron Road, Wichita, Kansas 67207. From his records check, Timmons learned that Jacob Molina had been arrested by the Wichita Police Department for unlawful discharge of firearms on August 11, 1992, but the misdemeanor complaint had been dismissed. Timmons also checked the driver's license photographs to determine whether Mr. Flores-Hernandez was using "Jacob Molina" as an alias. Jacob Molina's photograph established that he was not Mr. Flores-Hernandez.

On August 17, 2011, Perez and Timmons went to the White Cliff address to conduct additional surveillance, hoping to locate and apprehend Mr. Flores-Hernandez. At approximately 6:30 a.m., Timmons observed the gray Honda licensed to Jacob Molina in the drive way of the target residence, along with a new vehicle: a green Honda SUV. Timmons called for a records check of this license and learned that the vehicle was registered to a Jose Flores living at 2216 S. White Cliff Lane, Wichita, Kansas 67207. Timmons believed that this information matched the target's name and address he had previously found.

Timmons and Perez decided to wait for Mr. Flores to depart the residency. After no activity at the house, the defendants decided to approach the house to talk with the occupants. Neither officer was wearing an official law enforcement uniform. Timmons was wearing civilian attire with his badge on a neck chain displayed outside his shirt and body armor. Perez was wearing trousers and a blue polo shirt. He also had a tan vest over his body armor, which displayed a "POLICE" patch and a patch depicting an ICE badge. He wore his badge on a neck chain outside his vest.

Between 7:45 and 7:50 a.m., Timmons knocked on the front door of the residence and rang the doorbell. No one answered the door. He knocked and rang the doorbell again but received no answer. Two dogs came to the window and barked. Timmons stayed near the front door, periodically knocking and ringing the doorbell, believing the occupants might still be sleeping or just awakened and could be getting dressed.

At approximately 7:55 a.m., Molina's brother-in-law, Jose Florencio Flores-Euceda, answered the door but did not introduce himself. He stayed inside with the

3

storm door closed and talked to Timmons through the glass. Timmons introduced himself as an officer with DHS/ICE. Jose asked Timmons what he was doing there. Timmons looked at the target's photo and saw that the man who answered the door was not the target. Timmons said he was looking for Jose Flores, the man who drove the green SUV. Jose said that was his father. Timmons knew that the Jose Flores he was looking for was too young to be this man's father, so he asked the man in the doorway whether he was Jose Flores. The man said that he was not.

Timmons asked if the defendants could come in and talk with the man. Jose paused, asked if he could have a minute, and closed the door. The defendants waited about ten minutes before Timmons knocked and rang the doorbell again, but no one responded.

After shutting the door on the defendants, Jose called Jacob Molina and told him two men were at the house. Molina immediately drove to the house, arriving at approximately 8:05 a.m. When Molina got out of his car, Timmons recognized him from the photograph he had seen on Molina's driver's license during his investigation.

Timmons identified himself as an ICE agent and called out the name "Jacob Molina." Molina acknowledged that this was his name. Perez also introduced himself as an ICE agent and asked whether Molina lived at the White Cliff residence. Molina replied that it was his property, but he did not say that he lived at the residence.

Molina asked the defendants why they were there, and they said that they were investigating. Molina asked them whether they had a warrant to search the property and the defendants replied that they did not. They told Molina that if he was the

4

landlord and not the resident of the house, they were not interested in him. Molina suggested that, as the property owner, he could tell them to leave if they did not have a warrant. The defendants ordered Molina to leave, claiming he was interfering with their investigation.

Molina then took out his cell phone and called 911. He gave the dispatch operator the White Cliff address and said there were two individuals on his property. Before he could give any additional information, the defendants approached from behind Molina, forced him to the ground, and handcuffed him, leaving him face-down on the ground. Neighbors saw Molina face-down in handcuffs on the scene. Physically, Molina suffered a large welt and some bruising.

After helping Molina to a sitting position on the ground, Timmons called an assistant U.S. Attorney. They discussed whether the defendants should obtain a search warrant. While Timmons was on the phone with the attorney, Molina's wife Marlen arrived. Timmons explained to the Molinas that the officers were looking for Jose Antonio Flores-Hernandez, and he showed a photograph of the suspect. The Molinas stated that they did not know the suspect and that he did not live at the White Cliff residence. A short time later, an older Hispanic man approached the house on foot. The Molinas introduced the man as Marlen's father, Jose Florencio Flores-Euceda. This was not the Jose Flores the officers were looking for.

After a pair of Wichita Police Officers arrived (summoned by Molina's 911 call), Molina wrote down the defendants' names and Timmons gave him his supervisor's phone number if Molina wished to file a complaint. Molina filed the current lawsuit

against Timmons and Perez, asserting a *Bivens* action for unlawful arrest and excessive force.

**II. Legal Standard**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is proper if the moving party demonstrates there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. *Id.* The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). To meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly

6

probative. *Id.* at 249–50. Once the moving party has carried its burden under Rule 56, the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' " *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*).

**III. Analysis**

*A. Qualified Immunity*

The defendants argue they are entitled to summary judgment based on qualified immunity, which requires the court to use a different analysis than is typical at the summary judgment stage. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If so, the court must subsequently determine whether the right was clearly established. *Id.* (internal citation and quotation marks omitted). The court has discretion to address the two prongs in any order. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that

7

he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal citation omitted).

### 1. Violation of Molina's Fourth Amendment Rights

"Under *Bivens*, an individual has a cause of action against a federal official in his individual capacity for damages arising out of the official's violation of the United States Constitution under color of federal law or authority." *Dry v. United States*, 235 F.3d 1249, 1255 (10th Cir. 2000) (original emphasis omitted). Molina asserts that his Fourth Amendment rights were violated because he was unlawfully seized and the defendants used excessive force when they tackled him.

The courts typically categorize police/citizen encounters in three ways: consensual encounters, investigative stops, and arrests. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). "Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248-49 (10th Cir. 2012). "[T]he court must examine whether the investigative detention was (1) 'justified at its inception,' and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.' *Salas-Garcia*, 698 F.3d at 1248–49 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "If the seizure fails the two-pronged *Terry* test for an investigative detention, then the seizure becomes an arrest that must be supported by probable cause." *Id.* (internal citations omitted).

The defendants argue that their detention of Molina meets the *Terry* test because Molina was attempting to make the officers leave his property and cease their

investigation as to whether an illegal fugitive alien could be found there. They assert that a man of reasonable caution would have detained Molina long enough to discern whether Jose Flores was inside the house and to ensure that Molina was not calling family, friends, or anyone else who would keep the officers from carrying out their mission or harm them. This argument assumes that the defendants still had a reasonable suspicion that the target of their investigation might be at the White Cliff residence when Molina showed up. This assumption is flawed.

Reasonable suspicion requires an officer to have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). After reviewing a six-year-old warrant of removal/deportation for Jose Antonio Flores-Hernandez, Timmons searched available databases and determined that a man by that name might reside at 2216 S. White Cliff Road. As a result, Timmons and Perez showed up at this address with reasonable suspicion that an illegal immigrant might be at the residence. Upon arriving, the officers checked the registration on a green SUV in the driveway and learned that it was registered to a "Jose Flores" living at the address, which corroborated Timmons's database search results. At this point, the defendants reasonably believed that their target was the Jose Flores who lived at the White Cliff residence and owned a green SUV. This marks the apex of their justified suspicions.

After Timmons knocked on the door at the residence in question, Molina's brother-in-law answered the door. Based on the photograph of their suspect, the officers knew this man was not Jose Flores. When the officers asked the man who owned the

9

green SUV, the man stated that the vehicle was his father's and confirmed that his father's name was Jose Flores. The defendants admit that they recognized their target Jose Flores was too young to be the man's father.

At this point, the defendants knew that neither the male who answered the door, nor the owner of the green SUV, were their suspect. The defendants came to the home with evidence that a man named Jose Flores lived there, and they confirmed this. However, they discovered this was not the Jose Flores they sought because he would be too old to match their target's birthdate. In order for any remaining suspicions to be reasonable, Timmons and Perez needed evidence of multiple men named Jose Flores living at 2216 S. White Cliff Road. They did not have evidence suggesting this. In their briefs, the defendants provide no additional basis for finding their continuing suspicions reasonable. Any remaining suspicion the officers had for investigating the residence was based on mere hunch and speculation, rather than a particularized and objective basis.

As a result of this lack of reasonable suspicion, the court need not decide at this point whether the defendants' handcuffing and tackling Molina was a mere investigatory detention or an arrest; neither would be justified under these circumstances. The defendants' argument that Molina was interfering with their investigation is unpersuasive in light of the fact that they were on his property with no warrant and no reasonable suspicion for their investigation when he showed up. The court finds that Molina has properly shown that the defendants violated his Fourth Amendment right to be free of an unreasonable seizure.

2. Molina's Constitutional Right Was Clearly Established

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right." *Swanson v. Mountain View*, 577 F.3d 1196, 1119–1200 (10th Cir. 2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

In this case, the analysis of whether the right violated was clearly established is straightforward. In handcuffs, Molina found himself in an investigative detention, if not under arrest. The Fourth Amendment forbids unreasonable seizures. U.S. CONST. amend. IV. "Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity." *Salas-Garcia*, 698 F.3d at 1248–49. As officers of the law, this court has no doubt that Timmons and Perez were aware of Molina's clearly-established constitutional rights when they handcuffed him and forced him to the ground.

The court recognizes that these defendants perform difficult jobs. They are expected to protect and serve the community by enforcing the law, which often requires difficult analysis and quick thinking. The duties of the occupation and their constant interactions with less-than-honest suspects can naturally and necessarily give officers a suspicious mind. This is understandable—and often useful, under the appropriate circumstances—but the law requires officers to recognize the distinction between known facts and gut feelings. Reasonable suspicion is a minimal threshold with a

temporal aspect: facts that meet the threshold one moment may not meet it a moment later in light of new facts. Despite the difficulties of their job, the Constitution requires officers to constantly evaluate this threshold and assess whether it is currently met.

The court need not analyze in depth Molina's claim of excessive force. With no reasonable suspicions that their target resided at the White Cliff residence, the officers had no reasonable suspicion to believe Molina was harboring an illegal immigrant. The defendants' argument that Molina was interfering with their investigation is superseded by the fact that their investigation of the premises was no longer supported by the evidence, let alone a search warrant. Molina, as the owner of the property, was properly exercising his rights in asking the officers to leave. Further, the court is troubled by defendants' argument that Molina's calling the police could be construed as an illegal attempt "to make the officers leave his property." With no reasonable suspicion to detain Molina, the defendants' use of force was excessive, and Molina has presented facts supporting a finding of physical injury.

Timmons and Perez are not entitled to qualified immunity because they violated Molina's clearly-established constitutional rights by detaining him without the requisite level of suspicion.

*B. Genuine Dispute of Material Facts*

Molina sustained his burden of showing a violation of his clearly-established constitutional rights, so the burden shifts back to the defendants, who must prove that no genuine disputes of material fact exist and that the defendant is entitled to judgment as a matter of law. *See Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). Discovery is

far from complete in this case, due to the defendants' assertion of qualified immunity. Predictably, myriad disputes of material fact exist, making summary judgment inappropriate at this time.

The defendants claim their registration check of the green SUV outside the White Cliff residence revealed that the vehicle was registered to Jose Flores, which matched their target's name. Molina does not dispute that the green SUV was registered to Jose Flores, but argues that the vehicle was registered to Jose Florencio Flores-Euceda rather than the defendants' target—Jose Antonio Flores-Hernandez. This fact is material because if the registration did not match their target's name, the officers should have been aware of a potential misidentification problem before they even knocked on the door of the White Cliff residence.

The defendants claim that the male who opened the door of the White Cliff residence had a peculiar demeanor when he interacted with them, which made the defendants suspicious of his answers. Molina disputes this, claiming that his brother-in-law was merely having a difficult time understanding the officers because his dogs were barking. This factual dispute is material because if the man's actions reasonably made the police suspicious about his answers to their questions, a jury could conclude that the officers continued to have a reasonable suspicion that their target lived there.

Numerous questions remain if the disputed facts above resolve in favor of finding the defendants still had a reasonable suspicion that their target lived at the White Cliff residence. The parties supported their contentions with affidavits, and this

13

court cannot decide the credibility of those affidavits at this point. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The defendants argue that Molina refused to provide identification upon request, and that he spoke in a loud voice at times, as if to signal something to a person in the residence. These facts are material because they tend to add to the defendants' suspicions. Molina argues the defendants never asked for his identification, and that he did not raise his voice, so the defendants' alleged perceptions are unfounded.

The defendants assert that Molina acted aggressively towards them, claiming he "made a move" towards the defendants and rammed his shoulder into Perez's arm at one point before the officers subdued him. They claim Molina resisted his detention. Again, Molina denies all of this, claiming he was polite throughout the encounter. Clearly, a physical assault on Perez could justify the defendants' actions here.

The defendants allege that they asked Molina about Jose Flores but he refused to answer. Molina claims they did not mention Jose Flores until after they handcuffed him, at which point he said that he did not know the man they were looking for. The timing of this question is important, as the defendants rely on it in their assertion of reasonable suspicion/probable cause.

The defendants claim Molina never told them he was calling 911, and that they believed he might be calling someone to aid him in a crime or who might present a safety risk. Molina's contention that he did tell them he was calling 911 would obviously negate the officers' justification for their actions on this point, if believed.

The parties disagree on the force used by the defendants on Molina. Molina claims the defendants tackled him from behind. The defendants claim Timmons grabbed Molina's arm, called "DOWN," and then they "assisted Molina to the ground." This dispute goes to the core of whether the defendants used excessive force.

Finally, the parties disagree about the extent of Molina's injuries. Molina provides the court with a photo taken some time after the incident, which shows a welt and some bruising. The defendants claim that Molina told them that "he was fine," and any damage done to his person was "de mimimus." Evidence of the results of the force used by the defendants could help a jury determine whether the force used was reasonable.

These genuine disputes as to material facts require the court to deny the defendants' summary judgment motion.

IT IS THEREFORE ORDERED this 19th day of November, 2013, that Perez's and Timmons's Motion for Summary Judgment (Dkt. 18) is denied.

IT IS ALSO ORDERED, as a result of the court's denial of summary judgment, that Molina's Motion for Hearing (Dkt. 31) on this issue is denied as moot.

s/J. Thomas Marten  
J. THOMAS MARTEN, JUDGE