IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACOB MOLINA,

        Plaintiff,

v.                                                                                          Case No. 13-1025-JTM

AGENTS GREG PEREZ and
KARL TIMMONS, in their
individual capacities,

        Defendants.

## MEMORANDUM AND ORDER

Before the court is defendants' Second Motion for Summary Judgment. Plaintiff Jacob Molina filed a *Bivens* action against defendants Greg Perez and Karl Timmons for Fourth Amendment violations after they detained plaintiff on his property while investigating an immigration warrant for an individual who was not on the premises. Defendants moved for Summary Judgment (Dkt. 18) shortly after initial discovery disclosures, which the court denied. Discovery is now closed and defendants have filed a Second Motion for Summary Judgment (Dkt. 59). Defendants' Motion is denied.

### I. Undisputed Facts

Plaintiff Jacob Molina is a pastor who lives with his wife on Barron Road in Wichita, Kansas. The couple owns a home located at 2216 S. White Cliff Road, also in Wichita, where plaintiff's brother-in-law lives. The brother-in-law and plaintiff's father-in-law share the same name: Jose Florencio Flores-Euceda.

Defendant Perez has been employed by Immigration and Customs Enforcement ("ICE") and its predecessor agency, Immigration and Naturalization Service, since May 1997. He is currently a Deportation Officer (DO) under the ICE Office of Enforcement and Removal Operations (ERO). Defendant Timmons has been employed by ICE for approximately 19 years. He is currently employed as a DO with the ICE ERO, Fugitive Operations Team in Wichita. Both defendants have training on the proper use of force by law enforcement officers.

On July 1, 2011, defendants received information about an individual named Jose Antonio Flores-Hernandez (the "target"), a citizen of Honduras with an outstanding warrant of removal that was issued in August 2005. Through a search of available databases, Timmons determined that a male with the target's name and date of birth possibly resided at 2216 S. White Cliff Road, Wichita, Kansas 67207.

Timmons conducted surveillance at the target address twice in August 2011. He performed registration checks on the license plates of vehicles parked at the White Cliff residence and discovered who owned the vehicles. One of the license plates was registered to plaintiff at 9130 E. Barron Road, Wichita, Kansas 67207. Timmons learned from a records check that plaintiff had been arrested by the Wichita Police Department for unlawful discharge of a firearm on August 11, 1992, but the misdemeanor complaint had been dismissed. Timmons also checked driver's license photographs to determine whether the target was using "Jacob Molina" as an alias. Plaintiff's photograph established that he was not the target.

On August 17, 2011, Perez and Timmons went to the White Cliff address to conduct additional surveillance, hoping to locate and apprehend the target. At approximately 6:30 a.m., Timmons observed the gray Honda registered to plaintiff in the driveway of the White Cliff residence, along with a new vehicle: a green Honda SUV. Timmons called for a registration check on the green Honda; it was registered to a "Jose Flores" living at 2216 S. White Cliff Lane, Wichita, Kansas 67207. Timmons believed the information connected the target to the White Cliff residence, as suspected.

Defendants then decided to approach the house to talk with the occupants. Neither officer was wearing an official law enforcement uniform. Timmons was wearing civilian attire with his badge on a neck chain displayed outside his shirt and body armor. Perez was wearing trousers and a blue polo shirt. He also wore a tan vest over his body armor, which displayed a "POLICE" patch and a patch depicting an ICE badge, and his badge on a neck chain outside his vest.

Between 7:45 and 7:50 a.m., Timmons knocked on the front door of the residence and rang the doorbell. Nobody answered the door. He knocked and rang the doorbell again but received no answer. Two dogs came to the window and barked. Timmons stayed near the front door, periodically knocking and ringing the doorbell. He believed the occupants might still be asleep or just awakened and could be getting dressed.

At approximately 7:55 a.m., plaintiff's brother-in-law, Jose Florencio Flores-Euceda, answered the door but did not introduce himself. He stayed inside with the storm door closed and talked to Timmons through the glass. Timmons introduced himself as an ICE agent. Jose asked Timmons what he was doing there. Timmons

3

looked at the target's photo and saw that the man who answered the door was not the target. Timmons said he was looking for Jose Flores, the man who drove the green SUV. Jose said that was his father. Timmons knew that the Jose Flores he was looking for was too young to be this man's father, so he asked the man in the doorway whether *he* was Jose Flores. The man said that he was not.

The dogs continued barking in the house. Timmons asked if the defendants could come in and talk with the man, and if he would put the dogs away. The brother-in-law responded that he would go put the dogs away and he shut the door. The defendants waited about ten minutes before Timmons knocked and rang the doorbell again, but no one responded.

Unbeknownst to defendants, the brother-in-law had called plaintiff after shutting the door and told him two men were at the house. Plaintiff immediately drove to the house, arriving at approximately 8:05 a.m. When plaintiff got out of his car, Timmons recognized him from the driver's license photograph.

Timmons identified himself as an ICE agent and called out the name "Jacob Molina." Plaintiff acknowledged that this was his name. Perez also introduced himself as an ICE agent and asked whether plaintiff lived at the White Cliff residence. Plaintiff replied that it was his property, but did not say that he lived at the residence.

Plaintiff asked the defendants why they were there, and they said that they were investigating. He asked them whether they had a warrant to search the property and the defendants replied that they did not. Plaintiff suggested that, as the property owner,

4

he could tell them to leave if they did not have a warrant. The defendants did not have a warrant and ordered plaintiff to leave.

Plaintiff then took out his cell phone and called 9-1-1. He gave the dispatch operator the White Cliff address and said there were two individuals on his property. Before he could give any additional information, defendants approached plaintiff from behind, forced him to the ground and handcuffed him, leaving him face-down on the ground. As a result, plaintiff suffered a large welt and some bruising.

After helping plaintiff to a sitting position on the ground, Timmons called an assistant U.S. Attorney. They discussed whether defendants should obtain a search warrant. While Timmons was on the phone with the attorney, plaintiff's wife arrived. Timmons explained to plaintiff and his wife that the officers were looking for Jose Antonio Flores-Hernandez, and he showed a photograph of the suspect. Plaintiff and his wife stated that they did not know the suspect and that he did not live at the White Cliff residence. A short time later, an older Hispanic man approached the house on foot. Plaintiff's wife introduced the man as her father, Jose Florencio Flores-Euceda. This was not the Jose Flores the officers were looking for.

A pair of Wichita Police Department Officers arrived at 8:27 a.m., summoned by plaintiff's 9-1-1 call. Plaintiff was released from the handcuffs. He then wrote down defendants' names so he could file a complaint with their ICE supervisor. Plaintiff filed this *Bivens* action against Timmons and Perez, asserting Fourth Amendment violations for unreasonable seizure and excessive force.

## II. Summary Judgment Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "[A] movant that will not bear the burden of persuasion at trial" need only "point[] out a lack of evidence for the nonmovant on an essential element of the nonmovant's claim" to succeed on summary judgment. *Thom*, 353 F.3d at 851.

The party resisting summary judgment may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 249–50. Once the moving party has carried its burden under Rule 56, the party opposing summary judgment must do more than simply show there is some metaphysical doubt

as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*).

### III. Qualified Immunity Defense at Summary Judgment

Defendants argue they are entitled to summary judgment based on qualified immunity, which requires the court to use an atypical summary judgment analysis. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant[s] violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The court must evaluate whether a constitutional right was violated by considering the facts alleged "in the light most favorable to the party asserting the injury." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The court has discretion to address the two prongs in any order. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal citation omitted).

Where, as here, a case involves claims of both unreasonable seizure and excessive force arising from the same encounter, the justifications for each must be

evaluated separately. *See Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007). Thus, the court addresses the two-pronged qualified immunity test on each claim in turn.

### *A. No Qualified Immunity for Unreasonable Seizure*

<u>1. Plaintiff Was Unreasonably Seized</u>

"Under *Bivens*, an individual has a cause of action against a federal official in his individual capacity for damages arising out of the official's violation of the United States Constitution under color of federal law or authority." *Dry v. United States*, 235 F.3d 1249, 1255 (10th Cir. 2000) (original emphasis omitted). The Fourth Amendment prohibits "unreasonable searches and seizures" by government officials. U.S. CONST., amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The Supreme Court identifies three types of encounters between police and citizens: consensual encounters, investigative detentions, and arrests. *United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009); *Cortez*, 478 F.3d at 1115. "Consensual encounters are not seizures within the meaning of the Fourth Amendment and need not be supported by suspicion of criminal wrongdoing." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).

"Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248-49 (10th Cir. 2012). An investigative detention occurs when an officer stops and briefly detains a person for the purposes of investigation. *Cortez*, 478 F.3d at 1115. An investigative detention must be justified by "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Id.* "[T]he court must examine whether the investigative detention was (1) 'justified at its inception,' and (2)

'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Salas-Garcia*, 698 F.3d at 1248–49 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "If the seizure fails the two-pronged *Terry* test for an investigative detention, then the seizure becomes an arrest that must be supported by probable cause." *Id.* (internal citations omitted).

In denying defendants' first Motion for Summary Judgment, the court noted that the apex of their reasonable suspicion occurred upon arrival at the White Cliff residence, and that the encounter with the brother-in-law at the door should have dissipated that suspicion. Defendants now argue their detention of plaintiff meets the *Terry* test because the circumstances should have created reasonable suspicion in the mind of any competent officer that plaintiff was committing a crime: that he "could be hiding something . . . or someone." (Dkt. 60, at 15).

Defendants note that: their research indicated that someone lived at the White Cliff address with the same name and date of birth as the target; the brother-in-law failed to return to the door; plaintiff arrived unexpectedly after the brother-in-law failed to return; plaintiff questioned the officers' intentions and credentials; and plaintiff demanded that the officers leave his property. Defendants argue that these facts should have generated reasonable suspicion in any competent immigration officer's mind that plaintiff was harboring *an* illegal immigrant – even if not their original target. This argument fails.

Reasonable suspicion requires an officer to have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Oliver*, 209 F.3d

9

at 1186. After reviewing a six-year-old warrant of removal/deportation for Jose Antonio Flores-Hernandez, Timmons searched available databases and determined that a man named Jose Flores possibly resided at 2216 S. White Cliff Road. Timmons conducted surveillance on the White Cliff residence and found a grey Honda SUV registered to plaintiff – not to Jose Flores. On the morning in question, defendants determined that the new vehicle at the residence, a green Honda SUV, was registered to Jose Flores. (Dkt. 60, at 6). This corroborated Timmons's prior database search results indicating that "Jose Flores" possibly lived there. As a result, defendants walked to the front door of the White Cliff residence with reasonable suspicion that the target of their removal/deportation warrant might be inside. The court again finds that this is the apex of their justified suspicions.

Timmons knocked on the door and plaintiff's brother-in-law eventually answered. Based on the photograph of their suspect, the officers knew the man at the door was not their target. When the officers asked the brother-in-law who owned the green SUV, he said it was his father's and confirmed that his father's name was "Jose Flores." However, defendants admit they knew their target was too young to be the father of the man standing before them.

At this point, defendants knew that neither the male who answered the door, nor the "Jose Flores" who owned the green SUV, was their target. Thus, their formerly-justified suspicions had now dissipated. They arrived at the White Cliff residence with information that a man with at least a similar name and the same date of birth as their target lived there. They observed a vehicle registered to a man with a similar name as

10

their target. However, they soon learned that the vehicle did not belong to their target and that the man who answered the door was also not their target. Defendants were left with no remaining articulable facts indicating that crime was afoot. In order for reasonable suspicion to remain, defendants would have needed facts indicating that yet another man by the name of "Jose Flores" – not the man at the door or the owner of the green Honda – lived at the White Cliff residence. Defendants had no such evidence. Any remaining suspicion the officers had for investigating the residence was based on hunch or speculation, rather than a particularized and objective basis.

Defendants argue their suspicion shifted to plaintiff upon his unexpected arrival. According to defendants, their experience and training as immigration enforcement officers led them to reasonably suspect that plaintiff was committing a crime; that the timing of plaintiff's arrival, his questions and demands, and the use of his phone would give any reasonable officer reasonable suspicion that crime was afoot. However, defendants offer no evidence that they were aware of any association between plaintiff and illegal immigration activities other than the fact that he owned a house where they at one point had justified suspicion that an illegal alien may have been residing. Defendants had no other information indicating that plaintiff was committing a crime. Any suspicion defendants had was supported only by fear, speculation, or a hunch that the man before them, whom they had identified as the owner of the property, was warning an unidentified, hypothetical illegal alien of their presence. Defendants had no information connecting plaintiff to criminal activity and no objective factual basis to suspect that he was committing a crime. Their research that generated reasonable

suspicion in the residence – a vehicle and a possible tenant at the White Cliff residence – was unconnected to plaintiff upon his arrival. Suspicion as to both had been dissipated by defendants' investigation.

Defendants further argue they were justified in suspecting plaintiff of "concealing, shielding from detection, and harboring illegal aliens" because of information discovered *after* plaintiff's detention. (Dkt. 60, at 18). This reasoning, too, is flawed. Information acquired after the detention terminated cannot contribute to any justification at its inception or of its scope. *United States v. Hall*, 978 F.2d 616, 621 (10th Cir. 1992). Finally, defendants argue that plaintiff was interfering with their investigation. This is unpersuasive in light of the fact that, at the time plaintiff arrived, they were on his property without a warrant *after* their reasonable suspicion for investigating the property had dissipated. Plaintiff's detention was unjustified at its inception; defendants detained him without reasonable suspicion that he was committing a crime.

Absent reasonable suspicion, the court need not decide at this point whether defendants' handling and handcuffing of plaintiff was a mere investigatory detention or an arrest; neither would be justified under these circumstances.

Considering the facts alleged in the light most favorable to plaintiff, defendants violated his Fourth Amendment right to be free from unreasonable seizure.

2. Constitutional Right of Unreasonable Seizure Was Clearly Established

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official

12

would understand that his actions violate that right." *Swanson v. Mountain View*, 577 F.3d 1196, 1200 (10th Cir. 2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

In handcuffs, plaintiff was in an investigative detention, if not under arrest. The Fourth Amendment forbids unreasonable seizures. U.S. CONST. amend. IV. "Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity." *Salas-Garcia*, 698 F.3d at 1248–49. The contours of the right to be free from unreasonable seizure, often expressed as the limits of a *Terry* stop or seizure, have long been a part of the corpus of criminal procedural law. The court has no doubt that it would be clear to any reasonable officer that an investigative detention must be supported by reasonable suspicion, and an arrest by probable cause. Plaintiff's constitutional right was clearly established.

### B. No Qualified Immunity for Excessive Force

<u>1. Defendants Used Excessive Force</u>

The Fourth Amendment prohibits excessive use of force by federal officers. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The degree of physical coercion officers may use is limited by the Fourth Amendment's "reasonableness" standard. *Id.* at 395.

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

> Amendment interest against the countervailing governmental interests at stake . . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* at 396 (quotations, citations, and brackets omitted). The reasonableness of a seizure must be objectively determined "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff v. Packard*, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham*, 490 U.S. at 396). The analysis must "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

"[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a *lawful* arrest or detention under the circumstances of the case." *Cortez*, 478 F.3d at 1126 (emphasis added). Thus, the excessive force analysis is not affected by an unjustified arrest or detention; it must be evaluated as if the arrest or detention were justified. *Romero v. Story*, 672 F.3d 880, 890 (10th Cir. 2012) (citing *Cortez*, 478 F.3d at 1127). Upon showing that the force used exceeded that necessary to affect a lawful arrest under the circumstances, a claimant must then show actual injury that is greater than de minimus. *Cortez*, 478 F.3d at 1129 (finding that tight handcuffing may be excessive if actual injury results). Officers may, in some circumstances, force suspects to the ground, use handcuffs, and apply other

14

force to effect a detention. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). However, under the *Graham* reasonability analysis, such force is not reasonable in this case.

Defendants suspected plaintiff was harboring illegal aliens. The crime itself is nonviolent and poses little direct threat of harm to citizens or law enforcement. The governmental interest here was merely to investigate secondary to a failed warrant execution; defendants had no particularized, objective evidence that plaintiff was harboring an ICE fugitive. Defendants note that in *Finney v. Metzger*, 175 F. Supp. 2d 1296 (D. Kan. 2001), the court ruled that officers used reasonable force when they forced a suspect to the ground and handcuffed him for twenty-five minutes. However, *Finney* is distinguished because the officers in that case had detained a suspicious person while investigating what they mistakenly believed to be a *burglary in progress*. Burglary is an inherently dangerous crime involving the intrusion of another person's dwelling with intent to commit a felony; harboring an illegal alien is hardly as confrontational. Under the *Graham* reasonability rubric, *Finney* is a good example of officers using force commensurate with the severity of a dangerous crime. Here, the low severity of the crime and the minimal interests of the government favor an excessive force claim.

Defendants argue that plaintiff's use of a cell phone threatened their safety. According to plaintiff, defendants knew he was calling 9-1-1. The act of calling the police is not reasonably interpreted as a safety concern for officers already at the scene of a non-violent encounter. Even if they had not known who plaintiff was calling, defendants had no facts indicating that the call posed a threat to them. Although

15

defendants knew that plaintiff had been arrested for the unlawful discharge of a firearm, they also knew that he was not charged and that more than twenty years had since passed without further incident. Even though defendants had prior experience investigating deportation warrants that had turned violent, plaintiff did not exhibit behavior that a reasonable officer would have interpreted as presenting a threat of harm. Thus, it is not objectively reasonable for defendants to have determined that plaintiff "posed an immediate threat to the safety of the officers or others . . . ." *Graham*, 490 U.S. at 396-97. Further, plaintiff was not attempting to flee. Rather, he approached the officers to speak with them. Under the circumstances of the encounter, defendants' use of force was unreasonable.

Finally, plaintiff suffered actual injuries. Defendants forced plaintiff to the ground, handcuffed and dragged him. In *Cortez*, the court found no actual injury existed where handcuffs left red marks on plaintiff's wrists, but no other physical injury was present. Here, defendants caused scrapes and bruising on plaintiff's body.

Considering the facts alleged in the light most favorable to plaintiff, defendants applied excessive force in effecting plaintiff's detention or arrest.

2. Prohibition on Excessive Force Was Clearly Established

*Graham's* reasonable force requirements are, and have been, well-established. The use of force limitations placed on officers has no doubt long been in the training syllabus of ICE and its predecessor agency. There is little doubt that a reasonable officer knows he must use only that force which is commensurate with the nature and

16

circumstances of the alleged criminal activity. Plaintiff's constitutional right was clearly established.

The court recognizes that these defendants perform difficult jobs. They are expected to protect and serve the community by enforcing the law, which often requires difficult analysis and quick thinking. The duties of the occupation and their constant interactions with less-than-honest suspects can naturally and necessarily give officers a suspicious mind. This is understandable—and often useful, under the appropriate circumstances—but the law requires officers to recognize the distinction between known facts and gut feelings. Reasonable suspicion is a minimal threshold with a temporal aspect: facts that meet the threshold one moment may not meet it a moment later in light of new facts. Similarly, the force permitted to perform their law enforcement duties, and required for their safety and that of the public, is subject to change at a moment's notice. Despite the difficulties of their job, the Constitution requires officers to constantly re-evaluate and assess whether their actions are appropriate given the circumstances.

## IV. Genuine Dispute of Material Facts

Plaintiff sustained his burden of showing a violation of his clearly-established constitutional rights, so the burden shifts back to defendants. They must prove that no genuine disputes of material fact exist and that they are entitled to judgment as a matter of law. *See Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001). Myriad disputes of material fact exist, making summary judgment inappropriate.

Defendants claim that license plates had been changed between vehicles parked at the White Cliff residence. Plaintiff argues that license plates were not moved between vehicles. This fact is material because if no plates were moved, the defendants would have less reason to suspect illegal activity at the residence.

Defendants claim that, upon arrival at the White Cliff residence on the morning in question, they observed a green Honda SUV registered to the same name and address as their target. Plaintiff argues the green Honda SUV was not registered in the same name as the target, but to Jose Florencio Flores-Euceda, plaintiff's father-in-law; the ICE target is Jose Antonio Flores-Hernandez. This fact is material because if the registration did not match the target's name, then defendants should have been aware of a possible misidentification before they even approached the door of the White Cliff residence. This disputed fact goes to the very core of justifying defendants' suspicions upon arrival at the residence.

Defendants claim that they did not know who plaintiff was calling during their encounter, and that they thought he may be calling someone to aid him in committing a crime or who may present a safety risk to defendants. Plaintiff argues he told defendants he was calling 9-1-1. This fact is material because defendants may have had more reason to suspect plaintiff was committing a crime if he had concealed the nature of his phone call. Conversely, they would have less reason for suspicion if they knew he was calling 9-1-1.

The parties disagree as to the force used to detain plaintiff. Defendants say they grabbed his wrist and arms and he "went to the ground." (Dkt. 65, at 8). Plaintiff argues

18

that his "arms were pulled back and used as leverage to push him down and jerk his arms back" and that defendants dragged him. (Dkt. 65, at 8). Plaintiff also claims that defendants wrestled him to the ground. This factual dispute is material as to whether defendants used excessive force to detain plaintiff.

Finally, the parties disagree about the extent of plaintiff's injuries. Plaintiff provides the court with a photo taken some time after the incident, which shows scrapes and bruising. Defendants claim that plaintiff told them that "he was fine," and that any damage done to his person was "de mimimus." Evidence of physical injuries caused by defendants could help a jury determine whether the force used was reasonable.

These genuine disputes as to material facts require the court to deny the defendants' second summary judgment motion.

IT IS THEREFORE ORDERED this 17th day of December, 2014, that defendants' Second Motion for Summary Judgment (Dkt. 59) is denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE